1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11   FRANKIE ANITA T.,[1]                      Case No.:  20cv2049-MSB

12                                Plaintiff,   **ORDER REGARDING JOINT MOTION FOR**
                                               **JUDICIAL REVIEW [ECF NO. 15]**
13   v.

14   KILOLO KIJAKAZI, Acting Commissioner of
     Social Security,
15
                                Defendant.
16

17

18        On October 16, 2020, Frankie Anita T. ("Plaintiff") filed a Complaint pursuant to

19   42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social

20   Security ("Defendant") denying Plaintiff's application for supplemental security income.

21   (Compl., ECF No. 1.)  Now pending before the Court is the parties' Joint Motion for

22   Judicial Review ("Joint Motion").  (J. Mot., ECF No. 15 ("J. Mot.").)  For the reasons set

23   forth below, the Court **ORDERS** that judgment be entered affirming the decision of the

24   Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

25

26   _____

27   [1]  Pursuant to Civil Local Rule 7.1(e)(6)(b), "[o]pinions by the Court in [Social Security cases under 42
     U.S.C. § 405(g)] will refer to any non-government parties by using only their first name and last initial."
28

1

## I. PROCEDURAL BACKGROUND

2

On March 27, 2018[2], Plaintiff filed an application for supplemental security

3

income benefits under Title XVI of the Social Security Act, alleging disability beginning

4

January 26, 2018.  (Certified Admin. R., 266–68, ECF No. 12 ("AR").)  After her

5

application was denied initially and upon reconsideration, (id. at 120–38, 140–58),

6

Plaintiff requested an administrative hearing before an administrative law judge ("ALJ"),

7

(id. at 180–81).  An administrative hearing was held on January 2, 2020.  (Id. at 73–103.)

8

Plaintiff appeared at the hearing with counsel, and testimony was taken from her and a

9

vocational expert ("VE").  (Id.)

10

As reflected in his January 29, 2020 hearing decision, the ALJ found that Plaintiff

11

had not been under a disability, as defined in the Social Security Act, from March 15,

12

2018, through the date of the decision.  (Id. at 33.)  The ALJ's decision became the final

13

decision of the Commissioner on August 18, 2020, when the Appeals Council denied

14

Plaintiff's request for review.  (Id. at 1–7.)  This timely civil action followed.

15

## II. SUMMARY OF THE ALJ'S FINDINGS

16

In rendering his decision, the ALJ followed the Commissioner's five-step

17

sequential evaluation process.  See 20 C.F.R. § 404.1520.  At step one, the ALJ found

18

that Plaintiff had not engaged in substantial gainful activity since the application date.

19

(AR at 23.)  At step two, the ALJ found that Plaintiff had the following severe

20

impairments: left foot nodule of plantar fascia, hypertension, chronic anemia,

21

depression, schizoaffective disorder, post-traumatic stress disorder ("PTSD"), and

22

alcohol and methamphetamine use disorder.  (Id.)  At step three, the ALJ found that

23

Plaintiff did not have an impairment or combination of impairments that met or

24

medically equaled the severity of one of the impairments listed in the Commissioner's

25

Listing of Impairments.  (Id. at 24.)

26

27

─────────────

28

[2]  The ALJ incorrectly listed March 15, 2018 as the date of Plaintiff's application.  (See AR at 20, 23.)

1  Next, the ALJ determined that Plaintiff had the residual functional capacity

2  ("RFC") to do the following:

> perform medium work as defined in 20 CFR 416.967(c) except the claimant
> can lift and/or carry 50 pounds occasionally and 25 pounds frequently; the
> claimant can sit for 6 hours in an 8-hour workday; the claimant can stand
> and/or walk for 6 hours in an 8-hour workday with normal breaks; the
> claimant can frequently balance, kneel, stoop, crouch and crawl; the
> claimant is limited to understanding, remembering, and carrying out
> simple, routine, repetitive tasks, with breaks every two hours; no
> interaction with the general public, and to occasional work-related, non-
> personal, non-social interaction with co-workers and supervisors involving
> no more than a brief exchange of information or hand-off of product; the
> claimant cannot perform highly time pressured tasks such that the claimant
> is limited to generally goal-oriented work, not time sensitive strict
> production quotas (that is, production rate pace work with strict by the
> minute or by the hour production quotas that are frequently and/or
> constantly monitored by supervisors or that are fast paced); the claimant
> can work in a low-stress environment where there are few work place
> changes (i.e., the claimant would not have to switch from task to task) and
> the claimant has minimal decision-making capability.

16  (Id. at 26.)

17  At step four, the ALJ adduced and accepted the VE's testimony that Plaintiff is

18  capable of performing her past relevant work as a kitchen helper.  (Id. at 31, 99.)

19  Alternatively, at step five, based on the VE's testimony, the ALJ found that a

20  hypothetical person with Plaintiff's RFC could perform the requirements of occupations

21  that existed in significant numbers in the national economy, such as cleaner II, laundry

22  laborer, and food mixer.  (Id. at 32, 99.)  Therefore, the ALJ found that Plaintiff was not

23  disabled.  (Id. at 33.)

24  ### III.  DISPUTED ISSUE

25  As reflected in the parties' Joint Motion, Plaintiff is raising the following issue as

26  the grounds for reversal and remand—whether the ALJ properly considered the

27  testimony of Plaintiff.  (J. Mot. at 4.)

28  / / /

1

## IV.  STANDARD OF REVIEW

2      Section 405(g) of the Social Security Act allows unsuccessful applicants to seek

3 judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of

4 judicial review is limited, and the denial of benefits will not be disturbed if it is

5 supported by substantial evidence in the record and contains no legal error.  Id.; Buck v.

6 Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017) (citing Molina v. Astrue, 674 F.3d 1104,

7 1110 (9th Cir. 2012)).

8      "Substantial evidence means more than a mere scintilla but less than a

9 preponderance.  It means such relevant evidence as a reasonable mind might accept as

10 adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017)

11 (quoting Desrosiers v. Sec'y Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988));

12 see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  Where the evidence is

13 susceptible to more than one rational interpretation, the ALJ's decision must be upheld.

14 Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).  This includes deferring to

15 the ALJ's credibility determinations and resolutions of evidentiary conflicts.  See Lewis v.

16 Apfel, 236 F.3d 503, 509 (9th Cir. 2001).  Even if the reviewing court finds that

17 substantial evidence supports the ALJ's conclusions, the court must set aside the

18 decision if the ALJ failed to apply the proper legal standards in weighing the evidence

19 and reaching his or her decision.  See Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190,

20 1193 (9th Cir. 2004).

## V.  DISCUSSION

21

22 **The ALJ Provided Specific, Clear, and Convincing Reasons for Discounting Plaintiff's**

23 **Testimony**

24      Plaintiff argues that the ALJ failed to provide specific, clear, and convincing

25 reasons for rejecting Plaintiff's testimony.  (J. Mot. at 5–14.)  Plaintiff contends that in

26 his written opinion, the ALJ merely provided boilerplate language, followed by a

27 discussion of medical evidence, and the ALJ did not provide legally sufficient rationale to

28 discount Plaintiff's symptoms.  (Id. at 8–10.)  Plaintiff further argues that the ALJ failed

1  to link his reasons for rejecting Plaintiff's symptom testimony to Plaintiff's specific

2  statements regarding her symptoms, thereby precluding review of whether the ALJ's

3  decision is supported by substantial evidence.  (Id. at 11–12.)  Plaintiff argues that the

4  ALJ erred, and asks the Court to reverse the ALJ's decision and award benefits, or, in the

5  alternative, to remand the case for further proceedings.  (Id. at 14–15, 21–22.)

6      The Commissioner contends that the ALJ provided legally sufficient reasons for

7  discounting Plaintiff's symptom testimony.  (Id. at 16–21.)  The Commissioner alleges

8  that the ALJ properly identified medical evidence that contradicted, or did not

9  corroborate, the degree of limitations that Plaintiff alleged.  (Id. at 17–20.)  Further, the

10  Commissioner contends that the ALJ properly concluded that Plaintiff's conservative and

11  efficacious treatment undermined her alleged limitations.  (Id. at 19–20.)  The

12  Commissioner thus asserts that the ALJ's decision is supported by substantial evidence

13  and free of legal error, and should be affirmed.  (Id. at 19–20, 22–23.)

14      **1.    Applicable law**

15      When evaluating a claimant's allegations regarding subjective symptoms, the ALJ

16  must engage in a two-step analysis.  See Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir.

17  1996), superseded, in part, on other grounds by 20 C.F.R. §§ 404.1529(c)(3),

18  416.929(c)(3); see also Social Security Ruling ("SSR") 16-3p,[3] 2016 WL 1119029 (Mar. 16,

19  2016).  First, the ALJ must determine whether there is objective medical evidence of an

20  underlying impairment that "could reasonably be expected to produce the pain or other

21  symptoms alleged."  Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017) (quoting

22  Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014)).  The claimant is not required

23  to show that an underlying impairment could reasonably be expected to cause the

[3] SSR 16-3p, which went into effect before the ALJ's decision, rescinded and superseded SSR 96-7p and the former "credibility" language.  The Ninth Circuit noted that the SSR 16-3p "makes clear what [the] precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms' . . . and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness."  Trevizo, 871 F.3d at 678 n.5 (quoting SSR 16-3p).

20cv2049-MSB

severity of the pain alleged, but only that it could have reasonably caused some degree of the pain.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)).

Second, if the first step has been satisfied and there is no evidence of malingering, then the ALJ may reject the claimant's statements about the severity of their symptoms "only by offering specific, clear and convincing reasons for doing so."  Trevizo, 871 F.3d at 678 (quoting Garrison, 759 F.3d at 1014–15).  "The clear and convincing standard is the most demanding required in Social Security cases."  Revels, 874 F.3d at 648 (quoting Garrison, 759 F.3d at 1014–15).  General findings are insufficient, and the ALJ must identify which specific symptom statements are being discounted and what evidence undermines those claims.  See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citing Treichler v. Comm'r Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014)); Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005).  An ALJ's failure to identify specific statements and explain why they are not credible precludes meaningful review, because the reviewing court cannot determine if the ALJ's decision was supported by substantial evidence, and constitutes reversible error.  Brown-Hunter v. Colvin, 806 F.3d 487, 489 (9th Cir. 2015); see also SSR 16-3p.

"[B]ecause symptoms, such as pain, are subjective and difficult to quantify," the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about their symptoms, evidence submitted by their medical sources, and observations by the Agency's employees and other persons.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.  Factors the ALJ may consider, in addition to objective medical evidence, include Plaintiff's daily activities; the location, duration, frequency, and intensity of their pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; treatment; and any other measures used to relieve pain.  See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p.  The ALJ may also consider

1  inconsistencies between Plaintiff's statements and the medical evidence.  See 20 C.F.R.

2  §§ 404.1529(c)(4), 416.929(c)(4); SSR 16-3p.

3      **2.     Plaintiff's testimony during the administrative hearing and medical**

4  **records**

5          **a.     Relevant testimony during Plaintiff's administrative hearing**

6          Plaintiff testified that she had worked in a casino kitchen, washing dishes and

7  cleaning, until she "developed a condition with [her] fingers," whereby "they all became

8  numb," as well as problems with her hips and back.  (AR at 80.)  Plaintiff stated that she

9  cannot work because she is depressed, cannot "get out of bed" three or four times a

10  week, experiences sadness, cries all the time, sometimes hears voices, and sleeps with a

11  light on because she sometimes sees shadows at night.  (Id. at 83, 88–89.)  She feels "so

12  weak and so tired" that she does not "have the strength to get up and face the day."

13  (Id. at 88.)  Plaintiff has pain in her back, legs, hip, chest, and Achilles tendon.  (Id. at 80,

14  83, 89.)

15          Plaintiff further testified that she has problems with her memory, focus, and

16  concentration.  (Id. at 83, 86, 91.)  Plaintiff can only walk one block, stand for five

17  minutes, sit for twenty minutes, and lift and carry fifteen pounds.  (Id. at 90.)  Plaintiff

18  used a cane during the administrative hearing, and testified that her doctor prescribed

19  the cane, and she uses the cane to walk.  (Id. at 85, 90.)  Plaintiff also uses a hand brace

20  on her right non-dominant hand to help with the numbness and pain.  (Id. at 85–86.)

21          Plaintiff stated that she is receiving treatment for her high blood pressure and

22  diabetes, and plans to start physical therapy for her foot.  (Id. at 83.)  Plaintiff said that

23  she takes Metformin for diabetes; Seroquel, Zoloft, and "one other medication" for her

24  mental impairments; and Nitroglycerin, Naproxen, and Acetaminophen for pain.  (Id. at

25  87, 89, 93.)  Plaintiff also testified she had not used methamphetamine for seven-to-

26  eight months before the administrative hearing.  (Id. at 87.)

27          Lastly, Plaintiff testified that she has PTSD from stabbing and killing her daughters'

28  father in self-defense.  (Id. at 91–92.)  Her husband passed away from cancer, and this

1  contributes to her depression.  (Id. at 92.)  Plaintiff stated that her sons help her with

2  chores, and her younger son who lives with her pays the bills.  (Id. at 77–78.)

3              **b.    Medical records**

4       From May of 2017 to August of 2019, Plaintiff was examined and treated at the

5  Family Health Centers of San Diego.  (Id. at 391–423, 425–33, 475–80, 497–505, 829–37,

6  841–43, 846–52.)  With respect to physical limitations, Plaintiff reported shoulder pain,

7  (id. at 425, 660); lower back pain, (id. at 398, 402, 412, 475, 497, 501, 660, 836, 841,

8  850); hip pain, (id. at 398, 497); ankle pain, (id. at 475, 660); radicular pain to the legs,

9  (id. at 841); chest pain, (id. at 391, 836, 846, 850); right foot pain, (id. at 402); pain from

10  a lump on the bottom of her left foot, (id. at 425, 475, 834 (9/10 pain when walking));

11  and numbness in her fingers, (id. at 394).  Plaintiff was diagnosed with essential

12  hypertension, (id. at 395, 399, 403, 408, 413, 419, 427, 477, 498, 502, 837, 842, 847,

13  851); hyperlipidemia, (id. at 392, 399, 413, 418, 427, 832); iron deficiency anemia, (id. at

14  408, 413, 418, 502); type two diabetes, (id. at 477, 498, 832, 835, 848, 851); plantar

15  fascial fibromatosis, (id. at 832, 835); Achilles tendinitis, right leg, (id. at 477);

16  onychogryphosis, (id. at 835); cardiac murmur, (id. at 413); and vitamin D deficiency, (id.

17  at 399, 413).

18       Treatment notes indicate that Plaintiff had normal gait, (id. at 406, 497, 661); 5/5

19  muscle strength, (id. at 399, 498, 661); no muscle atrophy of the hands, (id. at 395);

20  appropriate tone and muscle build, (id. at 661); a negative Tinel's test,[4] (id. at 395);

21  intact sensation, (id.); and that she was not able to squat fully due to pain, (id. at 399,

22  498).  On August 27, 2018, at Plaintiff's request, she was prescribed a cane and

23  temporary back brace.  (Id. at 475, 477.)  On January 30, 2019, Plaintiff declined a

24

25

26

27  [4] "[A] Tinel's test 'is an orthopedic test used to detect irritated nerves.  Positive signs of a Tinel's test is
upon light tapping over a nerve the patient complains of a tingling sensation.'"  Ruby L. T. v. Berryhill,

28  Case No. 5:18-cv-00282-JDE, 2019 WL 185686, at *3 n.4 (C.D. Cal. Jan. 14, 2019) (citation omitted).

1   Toradol shot for her back pain.  (Id. at 850.)  Additionally, Plaintiff reported that she had

2   been diagnosed with an "enlarged heart."  (Id. at 403, 412.)

3          With respect to mental limitations, Plaintiff reported a history of depression, (id.

4   at 398, 412); normal appetite, (id. at 412); frequent alcohol consumption, (id. at 394,

5   398, 406); chronic fatigue, (id. at 394); lack of motivation or energy, (id. at 501); and

6   denied suicidal ideations, (id. at 398, 412, 497, 501).  During her exams, Plaintiff was

7   alert and oriented, (id. at 395, 399, 402, 413, 417, 498, 501); cooperative, (id. at 498,

8   501); pleasant, (id. at 417, 501); with a depressed mood, (id. at 501), and calm, (id. at

9   498).  Plaintiff's physicians noted her history of noncompliance due to missed office

10  visits and not following up with referrals.  (Id. at 398, 403, 501.)  Plaintiff also forgot to

11  take her medications at times, (id. at 501), but reported that the mental health

12  treatment was helping, (id. at 497).  Plaintiff was diagnosed with schizoaffective

13  disorder, (id. at 408); major depressive disorder ("MDD"), (id. at 399, 403, 498, 502,

14  848); and PTSD, (id. at 848).

15                      **ii.    Psychiatric evaluations**

16         On July 12, 2017, Dr. Bohy conducted a behavioral health assessment of Plaintiff.

17  (Id. at 562–66.)  Plaintiff reported being depressed, always feeling tired, having visual

18  and auditory hallucinations, and problems with memory and sleep.  (Id. at 562, 564.)

19  Plaintiff's back and foot pain was a 7/10.  (Id. at 563.)  Dr. Bohy found that Plaintiff was

20  alert; oriented to person, time, place, and current situation; moderately hygienic;

21  dressed appropriately; cooperative; of normal weight; that Plaintiff had coherent

22  thought processes; appropriate affect; age appropriate vocabulary; depressed mood;

23  normal memory; and age appropriate motor skills, judgment, and insight.  (Id. at 564–

24  65.)  Dr. Bohy diagnosed Plaintiff with schizoaffective disorder, depressive type; alcohol

25  use disorder; and methamphetamine use disorder.  (Id. at 565.)  Dr. Bohy also filled out

26  a "San Diego County Adult Medi-Cal Mental Health Severity Analysis" questionnaire and

27

28

1  assessed moderate "clinical complexity"[5] and "life circumstances,"[6] medium "benefit of

2  integrated care," and no risk of "suicidal/violent, high risk behavior, catastrophic

3  illness/loss, criminogenic behavior, impulsivity, insight, [and] ego discordance." (Id. at

4  565–66.)

5         From September 2017 to April 2018, Plaintiff was treated by Dr. Smith, a

6  psychiatrist. (Id. at 354–57, 438–44, 553–56.)  At the initial psychiatric evaluation on

7  September 28, 2017, Plaintiff alleged that she had been "depressed for years" and

8  "recently things [had] been worse." (Id. at 354.)  She reported that she had "very little

9  energy, [was] sleeping poorly, with poor concentration, [had] increased appetite,

10 anhedonia, guilt and hopelessness," "sometimes hear[d] a voice calling her name,"

11 "[saw] shadows out of the corner of her eye," and had "occasional nightmares." (Id.)

12 Additionally, Plaintiff stated that she felt extremely guilty for stabbing her daughters'

13 father in self-defense, which led to his death. (Id.)  Plaintiff stated she consumed

14 alcohol three-to-four nights a week and had used methamphetamine a few months

15 before the examination. (Id.)  Dr. Smith diagnosed Plaintiff with PTSD and MDD with

16 psychotic features that occur only during depressive periods. (Id. at 354, 356.)  He

17 prescribed Gabapentin and Lexapro. (Id. at 354–55.)

18        Dr. Smith's treatment note from January 10, 2018, stated that Plaintiff

19 experienced some improvement after taking prescribed medications, and that Plaintiff

20 reduced her alcohol intake to one-to-two nights per week. (Id. at 553.)  Plaintiff,

21

22 _____

23 [5] "Moderate clinical complexity" finding indicates "schizophrenia, major mood or anxiety disorder—
   stable on medications, baseline function, sustained recovery; prior history of effective treatment,
24 uncomplicated management; minimal cognitive impairment; no recent hospitalizations; [alcohol or
   drug disorder] misuse." Patricia C. v. Saul, Case No.: 19-cv-00636-JM-JLB, 2020 WL 4596757, at *3 n.4
25 (S.D. Cal. Aug. 10, 2020) (internal citations omitted).

26 [6] "Moderate life circumstances" finding indicates "intermittent emotional distress as a manifestation
27 of a mental illness which is worsened by life stressors; limited resources [and] support; strained
   resilience.'" Patricia C., 2020 WL 4596757, at *3 n.5 (internal citations omitted).

28

20cv2049-MSB

1   nevertheless, continued to drink, despite being advised that alcohol could exacerbate

2   her symptoms.  (Id. at 438, 441, 553.)  On February 14, 2018, Dr. Smith noted that

3   significant stressors in Plaintiff's life, such as losing her job at the casino, exacerbated

4   her depression and psychotic symptoms.  (Id. at 441–42.)  Plaintiff continued to have

5   auditory and visual hallucinations.  (Id. at 438, 441, 553.)

6       Dr. Smith repeatedly noted that Plaintiff had speech within normal limits; linear

7   thought processes; normal thought content; restricted mood and affect; and

8   appropriate associations, judgment and insight, fund of knowledge, attention span and

9   concentration, and recent and remote memory.  (Id. at 355, 439, 442, 554.)  Plaintiff was

10  alert and oriented, cooperative, and articulate.  (Id.)  Dr. Smith also repeatedly assessed

11  moderate "clinical complexity" and "life circumstances," medium "benefit of integrated

12  care," and no risk of "suicidal/violent, high risk behavior, catastrophic illness/loss,

13  criminogenic behavior, impulsivity, insight, [and] ego discordance."  (Id. at 356–57, 440,

14  443, 555.)  Dr. Smith reaffirmed his diagnoses of PTSD and MDD with psychotic features.

15  (Id. at 439, 442.)  However, on January 10, 2018, because Plaintiff's auditory

16  hallucinations were the "worst when she was depressed," Dr. Smith opined that this

17  "may suggest more of a schizoaffective disorder picture instead of MDD with psychotic

18  features."  (Id. at 553–54.)  On April 11, 2018, Dr. Smith noted that Plaintiff continued to

19  struggle with depressive symptoms, had "ups and downs," and was "depressed with low

20  energy and [had] difficulty getting up off the couch" four to five days a week.  (Id. at

21  438.)

22      On August 10, 2018, Dr. Glassman, a consultative examining psychiatrist,

23  completed a psychiatric evaluation of Plaintiff.  (Id. at 462–67.)  Dr. Glassman wrote that

24  Plaintiff stopped working because of "problems with her hands, with decreased use of

25  her hands, and also pain in her hip and low back."  (Id. at 463.)  Plaintiff reported that

26  she was not able to perform basic work because she could not "remember things," was

27  "very tired" and depressed, and had "very low energy, interest, or motivation."  (Id. at

28  464.)  Plaintiff further reported that she was anxious most of the time and had

1  intermittent suicidal ideation.  (Id. at 464–65.)  Plaintiff stated that her depression was

2  at its worst after she lost her husband and after she killed her daughters' father in self-

3  defense.  (Id.)  Plaintiff told Dr. Glassman that she consumed alcohol twice a week to

4  improve her mood, and had used methamphetamine three-to-four months before the

5  appointment.  (Id. at 464.)

6      Dr. Glassman noted that Plaintiff had problems with low self-esteem, abusive

7  relationships, feelings of alienation, identity confusion, lack of direction, affective

8  lability, controlling her anger and temper, and managing stress.  (Id.)  With respect to

9  Plaintiff's activities of daily living, Dr. Glassman wrote the following:

10      She stated that she does not sleep well.  It is hard to get to sleep, because
       of being worried and anxious.  She does not take care of her grooming very
11      well.  She can go a week or more without a shower.  She only brushes her
       teeth about once a week.  She stated she "tries" to do household chores,
12      but "[i]t is hard . . . [she] get[s] panic attacks, feel[s] the world is closing in!"
       She stated her son has to do much of the grocery shopping, as she is
13      avoidant of going there.

14

15

16  (Id. at 465.)

17      Dr. Glassman noted that during the examination, Plaintiff was "a bit rumpled and

18  unkempt in her physical presentation."  (Id. at 466.)  She was alert and oriented, had

19  socially appropriate behavior, was able to follow directions, and had coherent, relevant,

20  and goal-directed thought processes.  (Id.)  Plaintiff was "poorly engaged," "[h]er eye

21  contact was limited," and she "appeared very depressed," sobbing intermittently during

22  the evaluation.  (Id.)

23      Dr. Glassman diagnosed Plaintiff with ongoing alcohol and methamphetamine

24  use; dysthymic disorder; borderline personality features; and probable borderline

25  personality disorder.  (Id. at 467.)  As to Plaintiff's ability to function in a workplace

26  setting, Dr. Glassman found that:

27  / / /

28  / / /

1
2
3
4
5

> [f]rom a psychiatric perspective, she has moderate impairment in her capacity to get along adequately with others and to behave in a socially-appropriate manner, due to her poor grooming and significant depression. She has mild impairment in her capacity to understand and follow even simple instructions consistently.  [She] has moderate impairment in her capacity to maintain concentration, persistence, and pace, and to adapt to changes and stressors in a workplace setting.

6

7    (Id.)  Dr. Glassman further opined that "[a] clean and sober lifestyle and

8    appropriate substance abuse treatment" could decrease Plaintiff's symptoms and

9    improve functioning.  (Id.)

10        On November 1, 2018, Dr. Ariella conducted a behavioral health assessment of

11   Plaintiff.  (Id. at 539–43.)  Plaintiff reported:

12
13
14
15
16
17

> depressed mood, anhedonia, hypersomnia, fatigue, poor appetite, feelings of guilt or worthlessness, trouble concentrating, psychomotor retardation, thoughts of being better off dead.  [U]ncontrollable worry and nervousness about multiple issues, trouble relaxing, restlessness, irritability, and feeling afraid something awful might happen.  [S]ymptoms of posttraumatic stress disorder 2–3 times a week, including increased arousal, psychological and physiological responses to (and avoidance of) reminders of trauma, feeling of detachment, negative overall view of the world.

18   (Id. at 539.)  Plaintiff reported that her pain level was an 8/10.  (Id. at 540.)  Plaintiff also

19   stated that she had visual and auditory hallucinations.  (Id. at 541.)

20        Dr. Ariella noted that Plaintiff was alert; oriented to person, time, place, and

21   current situation; hygienic; dressed appropriately; cooperative; overweight; had normal

22   speech; coherent thought processes; appropriate affect; average intellect; age

23   appropriate vocabulary; depressed mood; normal memory; slowed motor skills; and age

24   appropriate judgment and insight.  (Id.)  Dr. Ariella diagnosed Plaintiff with PTSD; MDD;

25   recurrent; and generalized anxiety disorder.  (Id. at 542.)  Dr. Ariella assessed moderate

26   "clinical complexity" and "life circumstances," medium "benefit of integrated care," and

27   no risk of "suicidal/violent, high risk behavior, catastrophic illness/loss, criminogenic

28   behavior, impulsivity, insight, [and] ego discordance."  (Id. at 542–43.)  On May 8, 2019,

20cv2049-MSB

1  Dr. Ariella closed Plaintiff's case because Plaintiff was "[n]ot engaged in treatment at
2  [that] time." (Id. at 853.)

3      Dr. Dobos treated Plaintiff from November 2018 to January 2019. (Id. at 532–38,
4  775–78, 856–59.) At the initial evaluation, Plaintiff reported that she "had depression
5  for a number of years," did not have any energy, was "always tired," had nightmares
6  and flashbacks about the killing of her daughters' father, heard voices, saw shadows,
7  and had "passive thoughts of not caring if she goes on living." (Id. at 532.) Plaintiff
8  reported consuming alcohol three times a week, and using methamphetamine in March
9  2018. (Id.) Dr. Dobos diagnosed Plaintiff with MDD, recurrent; other psychotic disorder;
10 PTSD; generalized anxiety disorder; panic disorder; alcohol use disorder; and
11 methamphetamine use disorder. (Id. at 536.)

12     At subsequent visits, Plaintiff reported improved mood and a reduction in
13 psychotic symptoms after beginning Zoloft, but her auditory and visual hallucinations
14 persisted. (Id. at 775, 856.) Dr. Dobos reaffirmed his initial diagnoses. (Id. at 776, 857.)
15 Dr. Dobos noted that Plaintiff was pleasant and polite, (id. at 536, 776, 857); normally
16 groomed and attired, (id. at 536, 776, 857); alert, (id. at 536, 776); and sad and worried,
17 (id. at 536.)

18     Dr. Dobos found that Plaintiff had speech within normal limits; coherent and
19 circumstantial thought processes; paranoid ideation; auditory and visual hallucinations;
20 ideas of reference; fair judgment and insight; limited fund of knowledge; fair attention
21 span and concentration; anxious and depressed mood and affect; and appropriate
22 associations. (Id. at 535–36, 775–76, 856–57.) Plaintiff was alert and oriented,
23 cooperative, and articulate. (Id.) Dr. Dobos assessed severe "clinical complexity" and
24 "life circumstances," medium "benefit of integrated care," and mild risk of
25 "suicidal/violent, high risk behavior, catastrophic illness/loss, criminogenic behavior,
26 impulsivity, insight, [and] ego discordance." (Id. at 538, 777–78.)
27 / / /
28 / / /

### iii.   Physical examinations

On December 1, 2017, Plaintiff saw Dr. Puccinelli because of a painful lump in her left plantar arch and chronic heel pain. (Id. at 347.) Dr. Puccinelli noted that Plaintiff had a palpable firm module approximately 1.5 centimeters in diameter with pain to palpation, and "pain to palpation posterior right heel at insertion site of Achilles tendon." (Id.) Plaintiff had a decreased range of motion with her knee extended, and her sensation was grossly intact via light touch. (Id.) Dr. Puccinelli noted that Plaintiff was "[o]riented to person, place and time," and her "[m]ood and affect [were] normal and appropriate to situation." (Id.) Dr. Puccinelli diagnosed Plaintiff with plantar fascial fibromatosis, Achilles tendonitis, and equinus left and right. (Id.) He advised Plaintiff to wear supportive shoes, stretch daily, and prescribed physical therapy. (Id. at 348.)

Plaintiff was hospitalized on January 14, 2018, due to chest pain and numbness in both of her hands. (Id. at 367–69.) Her neurologic exam was normal, her head CT showed no evidence of acute intracranial abnormalities, and a chest x-ray showed a normal heart size. (Id. at 368, 377.) Plaintiff was alert and oriented, had "5 out of 5 muscle strength throughout," and her sensation to light touch was intact. (Id. at 370.) She was diagnosed with atypical chest pain, bilateral hand paresthesias, hypertension, dyslipidemia, hypertriglyceridemia, prediabetes, crystal methamphetamine abuse, and obesity, and discharged as stable on January 15, 2018. (Id. at 367–68.)

On August 31, 2018, Dr. Yashruti, a consultative orthopedic examiner, completed an orthopedic evaluation of Plaintiff. (Id. at 468–74.) Plaintiff complained of "[n]eck and low back pain with bilateral hip, right ankle, and foot pain with numbness in the tips of the fingers of both hands." (Id. at 468.) Plaintiff stated that she had been involved in a motor vehicle accident ten years ago, and in December 2017, or January 2018, she developed numbness in the tips of her fingers of both hands. (Id.) Plaintiff was taking Metformin, Gabapentin, and Abilify, which "helped a little," and used a cane when she was in pain. (Id.)

20cv2049-MSB

1   Dr. Yashruti noted that Plaintiff "walk[ed] with a mild right-sided limp," but was

2   able to walk on her heels and toes without the limp, and could partially squat.  (Id. at

3   469.)  Plaintiff had normal range of motion of the shoulders, elbows, wrists, fingers,

4   hips, knees, ankles, and feet.  (Id. at 470–71.)  She had a decreased range of motion of

5   the cervical and lumbar spine.  (Id.)  Plaintiff had full extension of her fingers, and her

6   Phalen's test[7] was negative.  (Id. at 471–72.)  She had no muscle weakness in upper or

7   lower extremities, and her straight-leg raising test was negative in both the sitting and

8   supine positions.  (Id. at 472.)

9   Dr. Yashruti opined that Plaintiff had the following functional limitations:

10   [Plaintiff] is able to sit with no limitations.  She is able to stand and walk on
    level ground six hours a day.  She is able to squat, kneel, crouch, and crawl
11   frequently.  She is able to lift 50 pounds occasionally and 25 frequently.
    She is able to reach with the arms and manipulate with the hands with no
12   limitations.

13

14   (Id. at 473.)

15   c.   **Disability determinations**

16   On September 18, 2018, at the initial level of review, Dr. Kalmar reviewed

17   Plaintiff's medical records based on her alleged impairments of depression, anxiety, high

18   blood pressure and cholesterol, arthritis, an enlarged heart, and numbness in the hands.

19   (Id. at 120–38.)  Dr. Kalmar found that Plaintiff had the following severe impairments: a

20   disorder of the back, essential hypertension, and substance addiction disorder.  (Id. at

21   129.)  Additionally, after finding that Plaintiff had moderate limitations with respect to

22   her ability to understand, remember, or apply information; interact with others; and

23   concentrate, persist, or maintain pace; and a mild limitation as to her ability to adapt or

24   manage herself, Dr. Kalmar concluded that Plaintiff's depression was not severe.  (Id.)

25

26

27   [7] "[A] Phalen's test is a maneuver used in the physical diagnosis of carpal tunnel symptoms."
    Christopher V. v. Comm'r, Soc. Sec. Admin., No. 3:17-cv-01503-HZ, 2019 WL 93502, at *9 n.3 (D. Or.
28   Jan. 2, 2019) (citation omitted).

1    Dr. Kalmar opined that Plaintiff could lift or carry fifty pounds occasionally and

2   twenty-five pounds frequently; stand, walk, and sit for six hours in an eight-hour

3   workday; and that Plaintiff had an unlimited ability to push and pull.  (Id. at 132.)  Dr.

4   Kalmar also found that Plaintiff's limitations ranged from "moderate" to "not

5   significantly limited" with respect to understanding and memory, concentration and

6   persistence, and social interaction.  (Id. at 133–35.)  Dr. Kalmar noted that Plaintiff's

7   statements regarding her symptoms of pain and weakness were not "substantiated by

8   the medical evidence alone," and her "statements regarding symptoms considering the

9   total medical and non-medical evidence" were "[p]artially [c]onsistent."  (Id. at 131.)  Dr.

10  Kalmar concluded that Plaintiff was capable of performing her past relevant work and

11  was not disabled.  (Id. at 136–37.)

12    On January 5, 2019, at the reconsideration level, Dr. Zukowsky reviewed Plaintiff's

13  records for the same alleged impairments, and an additional claim that Plaintiff was

14  borderline diabetic.  (Id. at 140–58.)  Dr. Zukowsky found that Plaintiff had the following

15  severe impairments: essential hypertension and substance addiction disorder.  (Id. at

16  149.)  Further, after finding that Plaintiff had moderate limitations with respect to her

17  ability to understand, remember, or apply information; interact with others;

18  concentrate, persist or maintain pace; and adapt or manage oneself, Dr. Zukowsky

19  concluded that Plaintiff's depression was not severe.  (Id.)

20    Dr. Zukowsky opined that Plaintiff could lift or carry fifty pounds occasionally and

21  twenty-five pounds frequently; stand, walk, or sit for six hours in an eight-hour workday;

22  and that Plaintiff's ability to push and pull was not restricted.  (Id. at 152.)  Dr. Zukowsky

23  also found that that Plaintiff's limitations ranged from "moderate" to "not significantly

24  limited" with respect to understanding and memory, concentration and persistence,

25  social interaction, and adaptation.  (Id. at 153–55.)  Dr. Zukowsky noted that Plaintiff's

26  statements regarding her symptoms of pain and weakness were not "substantiated by

27  the medical evidence alone," and her "statements regarding symptoms considering the

28  total medical and non-medical evidence" were "[p]artially [c]onsistent."  (Id. at 150–51.)

17

1  Dr. Zukowsky concluded that Plaintiff was capable of performing her past relevant work

2  and was not disabled.  (Id. at 156–57.)

3      **3.**    **Analysis**

4      Neither party contests the ALJ's determination that Plaintiff has the following

5  severe impairments: left foot nodule of plantar fascia, hypertension, chronic anemia,

6  depression, schizoaffective disorder, PTSD, and alcohol and methamphetamine use

7  disorder.  (See id. at 23; see also J. Mot.)  Because the ALJ found that Plaintiff's

8  "medically determinable impairments could reasonably be expected to cause the

9  alleged symptoms," a finding that is not contested by the parties, the first prong of the

10  ALJ's inquiry regarding Plaintiff's subjective symptoms is satisfied.  (See AR at 27; see

11  also J. Mot.)  Further, neither party alleges that the ALJ found that Plaintiff was

12  malingering.  (See J. Mot.)  As a result, the Court must determine whether the ALJ

13  identified which of Plaintiff's subjective allegations of impartment he discounted, and

14  whether the ALJ provided specific, clear, and convincing reasons for doing so.  See

15  Brown-Hunter, 806 F.3d at 489; Trevizo, 871 F.3d at 678; Garrison, 759 F.3d at 1014–15.

16      In his written opinion, the ALJ noted that Plaintiff alleged in the disability report

17  that she could not work due to "depression, anxiety, high blood pressure, high

18  cholesterol, arthritis, an enlarged heart and numbness in her hands."  (AR at 27.)  The

19  ALJ further stated the following with respect to Plaintiff's testimony:

20         At the hearing, the claimant testified that she lives with her son and he
       pays all the bills (*See Testimony*).  Her last employment was washing dishes

21         and she was let go as she developed a condition with her fingers and hips,
       as she could not perform the job.  She has medical issues and major

22         depression, somedays she cannot get [out] of bed due to sadness and
       hearing voices.  She further testified she cries all the time, and she limits

23         her exercise due to heart and back pain.  Her cane was prescribed about

24         two years ago, and her hand brace helps with the numbness.  The claimant
       stated she no longer uses methamphetamine, and last used [the drug]

25         seven or eight months ago.  She further testified she can stand for five

26         minutes and walk a block.  She can sit for twenty minutes before changing

27         positions.  She can lift and carry five pounds  (*Id.*).

28

1   (Id.)  The ALJ explained his two-step analysis of Plaintiff's symptom testimony as follows:

2
    After careful consideration of the evidence, the undersigned finds that the
3     claimant's medically determinable impairments could reasonably be
    expected to cause the alleged symptoms; however, the claimant's
4     statements concerning the intensity, persistence and limiting effects of
    these symptoms are not entirely consistent with the medical evidence and
5     other evidence in the record for the reasons explained in this decision.

6

7   (Id.)  The ALJ then discounted Plaintiff's statements regarding her impairments, citing

8   the following reasons: (1) Plaintiff's statements conflicted with the objective medical

9   evidence; (2) Plaintiff received conservative treatment for her mental health issues; and

10   (3) Plaintiff failed to follow a prescribed course of treatment.  (See AR at 28–30.)

11       When reviewing the ALJ's basis for discounting Plaintiff's testimony, the Court can

12   only assess the reasoning provided by the ALJ in his decision.  See Brown-Hunter, 806

13   F.3d at 495; Garrison, 759 F.3d at 1010.  The Court will therefore address the validity of

14   each of the ALJ's stated reasons for discounting Plaintiff's statements.

15         **a.**    **Inconsistencies between Plaintiff's testimony and objective medical**

16   **evidence**

17       The ALJ's identification of inconsistencies between Plaintiff's testimony and the

18   objective medical evidence is a clear and convincing reason to discount Plaintiff's

19   testimony.  See Koch v. Berryhill, 720 F. App'x 361, 364 (9th Cir. 2017) (finding that the

20   "ALJ properly discredited [plaintiff's] testimony because it was inconsistent with

21   objective medical evidence"; reasoning that "although [plaintiff] testified her carpel

22   tunnel syndrome caused significant pain and numbness in her hands, objective findings

23   were unremarkable and relatively mild"); Parra v. Astrue, 481 F.3d 742, 750 (9th Cir.

24   2007) (finding that inconsistencies between plaintiff's testimony and medical record are

25   proper grounds to discredit plaintiff's testimony); Burch v. Barnhart, 400 F.3d 676, 681

26   (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for

27   discounting pain testimony, it is a factor that the ALJ can consider in his credibility

28   analysis."); Raul V. v. Kijakazi, Case No.: 20-cv-2014-BGS, 2022 WL 3567008, at *5 (S.D.

1  Cal. Aug. 18, 2022) ("Inconsistency with objective medical evidence is a clear and

2  convincing reason to discredit claimant testimony.").

3        In this case, the ALJ stated in his written decision that "[t]he clinical findings of the

4  examining medical sources fail to corroborate the claimant's allegations of disabling

5  functional limitations," and "[t]he records since the claimant's alleged onset date show

6  no significant worsening of her symptoms since before her alleged onset date." (AR at

7  27.)  The ALJ further identified specific inconsistencies between Plaintiff's statements

8  and the objective medical evidence.

9        First, the ALJ identified Plaintiff's report that she had an "enlarged heart," which

10  Plaintiff also alleged as an impairment in her disability application.  (Id. at 24, 121.)  The

11  ALJ reasoned that there were no signs of acute heart failure during Plaintiff's

12  examinations, "no orthopnea, palpitations, shortness of breath or wheezing," and that

13  Plaintiff's chest x-ray revealed a normal heart size and no other physical abnormalities

14  that would suggest an enlarged heart.  (Id.; see also id. at 141, 377, 403, 412.)  The

15  medical records the ALJ cited and discussed support his conclusion.  (See id.)

16        Additionally, the ALJ discussed Plaintiff's allegation of numbness in her hands.  (Id.

17  at 24, 29–30.)  The ALJ pointed out that the record in this case indicates no muscle

18  atrophy in Plaintiff's hands, a negative Tinel's test, intact sensation, and a negative

19  Phalen's test.  (See id. at 24, 29–30; see also id. 367–69, 394–95, 468, 472.)

20        Further, in his subsequent discussion of the medical evidence, the ALJ also

21  detailed Plaintiff's alleged symptoms related to her mental, social, and cognitive

22  functioning, which she reported to various medical care providers.  (See id. at 27–29.)

23  The symptoms included low energy, poor sleep and concentration, increased appetite,

24  anhedonia, feelings of guilt and hopelessness, auditory and visual hallucinations,

25  frequent alcohol use, memory problems, constant anxiety, and panic attacks.  (Id.)  The

26  ALJ noted, however, that Plaintiff's examinations included findings that Plaintiff was

27  cooperative, calm, alert and oriented, articulate, able to follow directions, had socially

28  appropriate behavior, appropriate associations, and had "normal" speech, thought

1   processes, thought content, judgment, insight, attention span, concentration, and

2   memory.  (Id.; see also AR at 355, 439, 442, 466–67, 535–36, 541, 554, 564–65, 775–76,

3   856–57.)

4          Accordingly, the ALJ identified Plaintiff's specific statements regarding her

5   symptoms, and explained why they were inconsistent with the medical record.  Such

6   identification constitutes a specific, clear, and convincing reason to discount Plaintiff's

7   symptom testimony.  However, this reason cannot be the sole factor to reject Plaintiff's

8   symptom testimony.  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); 20 C.F.R.

9   § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5.  The Court will therefore examine

10  whether the ALJ provided other clear and convincing reasons for rejecting Plaintiff's

11  symptom testimony.

12              b.      Conservative mental health treatment

13         "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's

14  testimony regarding severity of an impairment."  Morris v. Astrue, 323 F. App'x 584, 586

15  (9th Cir. 2009) (quoting Parra, 481 F.3d. at 751).  Conservative treatment, nevertheless,

16  "is not a proper basis for rejecting the claimant's credibility where the claimant has a

17  good reason for not seeking more aggressive treatment."  Carmickle v. Comm'r, Soc.

18  Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (citation omitted).  "Discrediting a

19  [p]laintiff for not receiving inpatient mental health treatment is a position some district

20  courts have rejected or found questionable."  Duarte v. Berryhill, Case No.: 16CV2654 W

21  (BGS), 2018 WL 785819, at *9 (S.D. Cal. Feb. 8, 2018) (citing Mason v. Colvin, No. 1:12-

22  cv-00584 GSA, 2013 WL 5278932, at *6 (E.D. Cal. Sept. 18, 2013) (concluding that

23  treatment with antidepressants and antipsychotic medications was not "conservative");

24  Odisian v. Colvin, No. CV 12-9521-SP, 2013 WL 5272996, at *8 (C.D. Cal. Sept. 18, 2013)

25  (finding that treatment with psychiatric medications and sessions with a psychologist

26  did not constitute "conservative treatment"); Matthews v. Astrue, No. EDCV 11-01075-

27  JEM, 2012 WL 1144423, at *9 (C.D. Cal. April 4, 2012) ("Claimant does not have to

28  undergo inpatient hospitalization to be disabled").

In this case, the ALJ stated in his written opinion that Plaintiff received "conservative treatment for her mental health issues, and reported the treatment helped." (AR at 30; see also id. at 28.) Plaintiff's medical records contain her reports that the mental health treatment she was receiving was helping. (See i.e., id. at 497, 721 (Dr. Chug's July 13, 2018 note that Plaintiff "[is] currently seeing mental health for her depression" and "feels this is helping"); id. at 468 (Dr. Yashruti's August 31, 2018 note that Plaintiff reported she was treated with medications and "the treatment helped a little").) Nevertheless, it is not apparent that Plaintiff's mental health treatment consisting of therapy and medication was "conservative." Without further explanation from the ALJ, Plaintiff's alleged conservative treatment is not a specific, clear, and convincing reason to discredit Plaintiff's testimony. See Duarte, 2018 WL 785819, at *9–10; Odisian, 2013 WL 5272996, at *8; Matthews, 2012 WL 1144423, at *9.

### c.  Failure to follow a prescribed course of treatment

"An ALJ may discount an allegation of disabling excess pain based on 'an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" Moreno v. Comm'r Soc. Sec., Case No. 1:19-cv-01580-SAB, 2021 WL 84376, at *15 (E.D. Cal. Jan. 11, 2021) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)); see also Rachel G. v. Kijakazi, Case No. 5:20-cv-01594-GJS, 2022 WL 952630, at *4 (C.D. Cal. Mar. 29, 2022) (citation omitted) ("noncompliance with a prescribed course of treatment is [a] clear and convincing reason for finding a claimant's subjective complaints lack credibility").

In this case, the ALJ noted in his written decision that Plaintiff had not consistently taken her medications, and was repeatedly advised to comply with her prescribed treatment and medications. (AR at 28–29.) The medical record indicates that, at times, Plaintiff did not take her prescribed medications and did not follow the treatment recommended by her doctors. (See i.e., id. at 401–02 (Dr. Chung's October 24, 2017 note that Plaintiff "has not been taking her BP medications as instructed. Takes it some

days and does not some days"; and that "much time [was] spent on counseling patient on importance of taking medications as directed"); id. at 501 (Dr. Chung's June 29, 2018 note that Plaintiff "has not followed through with physical therapy" and "[f]orgets to take her medications at times").)  Accordingly, Plaintiff's failure to follow a prescribed course of treatment is an additional specific, clear, and convincing reason provided by the ALJ to discount Plaintiff's symptom testimony.  See Rachel G., 2022 WL 952630, at *4.

## VI.  CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that the ALJ properly identified which of Plaintiff's statements he discounted, and that the ALJ provided specific, clear, and convincing reasons for doing so.  The Court therefore **ORDERS** that judgment be entered affirming the decision of the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) and dismissing this case.

**IT IS SO ORDERED.**

Dated:  September 8, 2022

Honorable Michael S. Berg
United States Magistrate Judge